UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Maria V. Carmona
8306 Haven Hill Court
Laurel, Maryland 20723
301-490-4328


V.                                    CIVIL ACTION NO. 05cv2428 (JGP)


John W. Snow
Secretary of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC  20220


## PLAINTIFF STATEMENT REGARDING DEFENDANT'S
## FALSE STATEMENTS AND PERJURY BEFORE THE COURT

1    In two *Unsworn Declarations Under Penalty of Perjury*[1] submitted to the Court in

2    Defendant's March 17, 2006, *Motion to Dismiss or for Summary Judgment* [#6] officials of the

3    Department of the Treasury Office of Inspector General committed perjury, knowingly making

4    false statements material to Plaintiff's case, as presented in this statement to the Court

5    with supporting documentary evidence.  Plaintiff asserts that Defendant's presentation of

6    false declarations before this Court also evidences pretext.

7        In addition, Plaintiff asserts that Defendant's perjurious declarations before the Court in

8    this civil case are a continuation of the pattern and practice of false and perjurious statements

9    by Defendant that Plaintiff brought to the Court's attention in related case 04cv0589 (JGP),

---

[1] Each *Declaration* states that it is made in accordance with the provisions of 28 U.S.C. 1746, and ends with the following statement: *I declare under penalty of perjury that the foregoing is true and correct.*

RECEIVED

JUN 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

10    specifically with reference to statements provided by current Deputy Inspector General

11    Dennis Schindel, former Deputy Assistant Inspector General William Pugh, and former Director

12    Antoine F. Jabre-Elachkar;[2] and in related case 05cv1194 (JGP), specifically with reference to a

13    declaration provided by Assistant Inspector General for Audit Marla A. Freedman.[3]

14    Plaintiff is filing this *Plaintiff Statement* on the same day as, but separate from,

15    her *Opposition to Defendant's Motion to Dismiss or for Summary Judgment* to bring forward

16    what is a very serious matter. A copy of this *Plaintiff Statement* is also included a P.Ex. 1[4] in

17    Plaintiff's *Opposition*.

18    Plaintiff asserts that the type and extent of material false statements and misrepresentations

19    in the two *Declarations* calls into question Defendant's credibility in his entire *Motion to*

20    *Dismiss or for Summary Judgment* [#6] in this civil case; in the nineteen formal administrative

21    EEO complaints that Plaintiff has been forced to file to date; and in the three other civil cases

22    that Plaintiff has been forced to file to date in pursuit of her right to equal employment

23    opportunity. [01cv0115 (CKK), related case 04cv0589 (JGP), and related case 05cv1194 (JGP)]

24    Plaintiff also asserts that the type and extent of this perjury provides indisputable direct

25    evidence and support for Plaintiff's claim of conspiracy by officials of the United States

26    government to deny Plaintiff her civil right to equal employment opportunity.

---

[2] See *Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment* [# 16] in related case 04cv0589 (JGP), particularly Plaintiff's detailed disputation [#16, P.Ex. D] of statements provided by Schindel, Pugh, and Elachkar.

[3] See *Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment* [# 26, P.Ex. 1] in related case 05cv1194 (JGP). See also [#25].

[4] D.Ex. refers to Defendant Exhibit; P.Ex. to Plaintiff Exhibit. It is noted that many of the P.Ex. included in this *Plaintiff Statement* were submitted as evidence in the EEO complaint that is the subject of 05cv2428 (JGP). These documents are included here again for ease of reference.

27                    **Declaration of AIGA Marla A. Freedman**

28          In an *Unsworn Declaration Under Penalty of Perjury*[5] purportedly executed on April 17,

29    2003, and submitted to the Court in Defendant's March 17, 2006, *Motion to Dismiss or*

30    *for Summary Judgment* [#6, D.Ex. 4] Assistant Inspector General for Audit (AIGA) Marla A.

31    Freedman committed perjury, knowingly making false statements material to Plaintiff's case, as

32    presented in this statement to the Court with supporting documentary evidence.[6]  Plaintiff asserts

33    that Defendant's presentation of a false declaration before this Court also evidences pretext.

34          Plaintiff notes that AIGA Freedman provides no documentary evidence in support of any of

35    the statements that she makes in her *Declaration*.  In addition, Defendant fails to provide

36    statements from other parties that Freedman states clearly had a role in the matters discussed,

37    including but not limited to, Jeffrey Rush, Dennis Schindel, and Robert (Bob) Taylor.

38    [#6, D.Ex. 4, Pg. 2]   As such, it is Plaintiff's understanding that Freedman is speaking for these

39    individuals named above; that, as such, absent their personal statements, they too have

40    committed perjury; and that the actions of these individuals clearly evidence conspiracy

41    on their parts to deny Plaintiff her civil right to equal employment opportunity.

42          AIGA Freedman's *Declaration* is presented in a question and answer format, which is also

43    used below, with Freedman's statements presented in ***bold italics***, followed by Plaintiff's

44    explanations of why some of Freedman's statements constitute perjury, and why Plaintiff

---

[5] The *Declaration* states that it is made in accordance with the provisions of 28 U.S.C. 1746, and ends with the following statement: *I declare under penalty of perjury that the foregoing is true and correct.*
[6] It is noted that this *Plaintiff Statement* addresses only the content of AIGA Freedman's above-cited *Unsworn Declaration Under Penalty of Perjury*. This *Plaintiff Statement* presents false statements by Freedman that have been identified by Plaintiff as of the date of filing, and does not preclude the subsequent identification of other false statements in this or other documents submitted by Defendant.

45    challenges other statements made by Freedman based on available evidence.[7]  Plaintiff also

46    provides indisputable evidence of Freedman's perjury in the exhibits that are part of this

47    *Plaintiff Statement.*

48    **Question.**  What is your supervisory relationship to the Complainant,[8] Maria V. Carmona, and

49    the duration of the relationship?  [#6, D.Ex. 4, Pg. 1]

50    Freedman's Response:

51    *I have been her third line supervisor since March 2001 when I came to this position.*[9]

52    *Prior to that I was her second line supervisor from April 1999 until March 2001.*  [*id.*]

53    These are false statements.  Freedman knows that these are false statements because

54    (1) Plaintiff reported directly to Freedman during the period August 29, 1999, through

55    March 11, 2000, when Plaintiff served as Acting Director, Office of Finance and Debt;[10] and

56    (2) Freedman was Plaintiff's second-line supervisor while Plaintiff served as Acting Director,

57    Banking and Fiscal Service, during the period June 24, 2001, through July 21, 2001.

58    While Plaintiff was Acting Director, Office of Finance and Debt, during the period

59    August 29, 1999, through March 11, 2000, Freedman interfaced with Plaintiff on a regular basis,

---

[7] Plaintiff notes that Defendant filed a pre-discovery *Motion to Dismiss or for Summary Judgment* [#6].  Plaintiff asserts that full and complete responses to all of Plaintiff's planned discovery requests may uncover further evidence of perjury by Defendant.

[8] Freedman's *Unsworn Declaration Under Penalty of Perjury* was signed before Plaintiff filed this civil action. The term *Complainant* was used to refer to Plaintiff during the administrative EEO process.

[9] Plaintiff believes that the reference to *this position* is Freedman's statement in her *Declaration*, above the cited question and answer, that *My title is Assistant Inspector General for Audit.*  [#6, D.Ex. 4, Pg. 1]  Freedman's prior position was *Deputy Assistant Inspector General for Audit.*  [05cv1194 (JGP), #14, D.Ex. 4, Pg. 1]

[10] The dates August 29, 1999, through March 11, 2000, correspond with the dates that Plaintiff used in her *Statement of Significant Accomplishments* for the period when she served as Acting Director, Office of Finance and Debt. In general, Treasury OIG Acting assignments corresponded to pay periods, which lasted 2 weeks, began on a Sunday (e.g., August 29, 1999) and ended on a Saturday (e.g., March 11, 2000).  Plaintiff notes that in Plaintiff's performance appraisal for the period Freedman entered 8/26/99 – 3/11/00. (P.Ex. B, Pg. 3).

60   had direct knowledge of Plaintiff's work, and was very complimentary of Plaintiff's leadership

61   of the office. Evidence includes, but is not limited to, the following.[11]

62   a.   Freedman selected Plaintiff to serve in an Acting capacity as one of the Directors

63       who reported directly to Freedman in her position as Deputy Assistant Inspector General

64       for Audit (DAIGA). The *Notification of Personnel Action* indicates that Plaintiff was

65       temporarily promoted to a GM-0511-15 Supervisory Auditor position, for a period

66       designated as effective 08/29/99 NTE[12] 12/25/99. (P.Ex. A) When this period ended,

67       Plaintiff continued in an Acting Director capacity, without the corresponding increase in

68       grade or comparable salary, until March 11, 2000. Further evidence of this is provided in

69       *Items b-g* below and related exhibits.

70   b.   Freedman gave Plaintiff her appraisal for the period and signed the corresponding form

71       as the *Rating Official*. The *Performance Evaluation* (P.Ex. B) indicates that the rating

72       was given by Freedman, and the form signed by both Freedman and Plaintiff, on June 20,

73       2000, and shows Freedman's title as DAIGA. Freedman's initials are also included

74       by the two additional performance elements that applied to supervisory positions,

75       i.e., *Effective Supervision and Management* and *Equal Opportunity and Diversity.*

76       Plaintiff notes that the OIG's performance appraisal system during that period allowed

77       only two rating levels: *Acceptable* and *Unacceptable*. Freedman gave Plaintiff an

78       *Acceptable* in each category, telling Plaintiff that she did an *exceptional job* as

---

[11] Plaintiff wishes to call witnesses before a jury for additional evidence. A list of witnesses will be provided at the appropriate time.
[12] NTE stands for Not To Exceed, and is often used to designate temporary promotions which are not to exceed 120 days.

79  Acting Director (see Item *d* below).  In addition, Plaintiff received a cash award (see

80  Item *d* below).

81  c.  Plaintiff received a performance award for this appraisal period.  Such an award

82  would have been indicative of the level of performance discussed in *Item d* below.

83  The corresponding *Notification of Personnel Action* shows the amount of the cash award,

84  with an effective date of 07/17/00.  (P.Ex. C)

85  d.  In discussing Plaintiff's assignment as Acting Director, Freedman praised Plaintiff for the

86  very positive effect that Plaintiff had on the functioning of the office and for all that was

87  accomplished during this period, which lasted more than 6 months.  Freedman told

88  Plaintiff that she did an *exceptional job* as Acting Director, that she was a pleasure to

89  work with, and that she demonstrated capabilities to the point where Freedman knew she

90  did not have to worry about anything, giving her a sense of confidence that the area was

91  being handled well.

92  With reference to managerial skills, Freedman stated that Plaintiff kept on top of

93  everything, could answer questions, and always turned things in on time or early.

94  Freedman told Plaintiff that her organizational skills were a *real plus* for management

95  positions, that she knew she could rely on the quality of Plaintiff's products,[13] and that

96  Plaintiff's audit report packages always came up well-organized, complete, and neatly

97  presented.

---

[13] Freedman contrasted this to work products that she received from other Directors, which she stated required review with a *fine-toothed comb*.

98    Freedman also told Plaintiff that the others who had served as acting had done a good

99    job, that everyone brought something different to the job, but that Plaintiff did an

100    *exceptional job.* Freedman stated that she was not promising anything, but that if there

101    were an opening for a Director in Program Audit.... Freedman stated that there should be

102    openings, including some retirements within the next couple of years, and that she didn't

103    know if Plaintiff would have the patience to stay until that point.[14]

104    e. Freedman nominated Plaintiff, as Acting Director, and members of Plaintiff's staff,

105    for a *Special Act Award* for work performed during the August 1999 to March 2000

106    time frame. Plaintiff is providing (1) the *Recognition of High Level Performance,*

107    OIG Form 2130.1 (unsigned), (2) the *Notification of Personnel Action,* and

108    (3) the *Certificate of Appreciation for Special Act* for this award.[15]  (P.Ex. D)

109    It should be noted that Plaintiff requested a copy of the official nomination/justification

110    documents in discovery, but Defendant was not responsive. [Ref. 04cv0589 (JGP), #62,

111    Exhibit B, Item 3 under *Requests for Production of Documents.*]  However, it is

---

[14] The comments made by Freedman during this discussion of Plaintiff's performance parallel those made by others throughout Plaintiff's over 20-year career with the Treasury OIG, to include current Deputy Inspector General Dennis Schindel during 1991 when he gave Plaintiff an *Outstanding* rating and a performance award, as documented in related case 04cv0589 (JGP) [#16, P.Ex. C-2 (3 pages)] and those in the Performance Evaluation with an *Exceptional Performance* rating for Plaintiff for the period July 1, 2001, through June 30, 2002, submitted by Defendant as evidence in related case 05cv1194 (JGP) [#6, D.Ex. 3, Pgs. numbered 79-88, including *Rating Official Comments* at Pg. 85]. The comments made during 1991, 2000, and 2002, as well as the performance and special act awards, all evidence Plaintiff's high level of performance over the long term.

[15] Please note that, in the interest of privacy, Social Security numbers and the names of some staff members have been blocked out by Plaintiff on copies of some of the documents provided. Copies including these elements are available on request.

112          Plaintiff's understanding that Freedman signed the award form,[16] as evidenced by

113          an e-mail message that was sent to Freedman on April 12, 2000, by the Treasury Office

114          of Inspector General (OIG) office that processed the award, which states, in part,

115          *The Special Act awards you requested for Carmona...* (and three others) *...has been*

116          *processed effective 3/26/00.*  Freedman forwarded this e-mail message to Plaintiff

117          the next day, with a note stating *Please share with staff, as appropriate...*

118          *CONGRATULATIONS!!*  (P.Ex. E)

119     f.   Freedman personally sent an e-mail message to members of Plaintiff's staff

120          on January 28, 2000, indicating that Plaintiff would continue to serve as

121          Acting Director *Finance and Debt*.  (P.Ex. F)  This was a clear indication not only of

122          Freedman's continued confidence in the work Plaintiff was doing, but also was reflective

123          of the confidence the staff assigned to Plaintiff had in working with Plaintiff, and also

124          was reflective of Plaintiff's positive working relationships with other managers both

125          inside and outside the Treasury OIG, as Plaintiff has done throughout her career.

126     g.   Freedman sent Plaintiff a number of e-mail messages that provide evidence that

127          Freedman was Plaintiff's first line supervisor during the period August 29, 1999, through

128          March 11, 2000, and that she was pleased with the work that Plaintiff was doing.

---

[16] From a telephone discussion with Freedman on March 9, 2000, it is Plaintiff's understanding that Dennis Schindel was the approving official for the award.  Freedman told Plaintiff that Schindel was very pleased with the audit, and that it took 5 minutes or less of conversation for a decision to be made.  Freedman stated that *it was not a hard sell*, which differed from other recommendations for award that she had put through, which Schindel had kicked back one or more times (lowered amount, not granted).

129    These e-mail messages contain Freedman's comments to this effect, including the

130    following examples (P.Ex. G).

131    - *I did want to let you all know that I was very pleased with* (sic) *briefing you all*

132    *gave to Mr. Rush.*[17] *You did a great job!!* ☺ (12-10-1999)

133    - *Once again, great job yesterday!!* (01-06-2000)

134    - *Good job!!... Thanks for the quick/quality turn around!!* (02-07-2000)

135    - *This looks good to me.* (02-25-2000)

136    - *I am not completely through it yet...so far, it looks pretty darn good!* (03-02-2000)

137    As mentioned above, Freedman's claim that she has been Plaintiff's ***third line supervisor***

138    ***since March 2001*** [#6, D.Ex. 4, Pg. 1] is also a false statement because Freedman was Plaintiff's

139    second-line supervisor while Plaintiff was temporarily promoted to the Grade 15 when she

140    served as Acting Director, Banking and Fiscal Service, during the period June 24, 2001, through

141    July 21, 2001.  Freedman was responsible for naming Plaintiff to this position, and interfaced

142    with Plaintiff as a second-line supervisor during this period.[18]  For example, Plaintiff attended

143    Freedman's periodic staff meetings with the Directors, and Freedman routinely included Plaintiff

144    among the Directors to whom she sent e-mail messages about subjects such as Congressional

145    testimony and submissions by the Office of Audit to a weekly report to the Secretary of the

146    Treasury.  Freedman was subsequently involved during the November 2001 to March 2002 time

---

[17] Mr. Rush was the Inspector General for the Department of the Treasury at the time.  The term *you all* refers to Plaintiff as the Acting Director and to three members of her staff at that time.

[18] Plaintiff's first-line supervisor during this period was Donald R. Kassel, who was the Acting Deputy Assistant Inspector General (DAIG) under Freedman.  When Kassel was out of the office for a week, Freedman considered whether Plaintiff would serve as Acting DAIG in his absence, but decided against that.  (P.Ex. H, Pg. 2)

147    frame in resolving the incorrect processing of the Personnel Actions to reflect Plaintiff's

148    temporary promotion. (P.Ex. H[19])

149    **Question.** What knowledge, if any, did you have of the Complainant's sex, national origin,

150    age, ...? .... [#6, D.Ex. 4, Pg. 1]

151        Freedman's Response (partial):

152        *I was not aware of her age until I responded to an EEO complaint in July 2002. ...*

153        *I am not sure when I first became aware of the Complainant's national origin.* [*id.*]

154    Plaintiff asserts that this is a false statement. As a senior management official[20] Freedman

155    knew Plaintiff's age and whether she was, or was not, of Hispanic national origin.

156        In addition, Plaintiff believes that the statements that Freedman makes denying that sex, age,

157    national origin, and retaliation played a role in her decisions are not true, and wants the

158    opportunity to call Freedman before a jury to further explore this issue. Freedman's categorical

159    denial (*Absolutely not.*[21]) in her *Declaration* [#6, D.Ex. 4, Pg. 3] is false based on clear and

160    indisputable evidence presented herein and requires further exploration by calling witnesses

161    before a jury. Freedman's response can be called into question when management consistently

162    promotes males, as Freedman stated she was planning to do for this position [*id.*, Pg. 2], and

163    as was done in three selections in which Freedman stated she had a role within a 2-year period

164    in related case 05cv1194 (JGP) [#14, D.Ex. 4, Pg. 9, Question 11]. Plaintiff has asserted that

---

[19] A March 21, 2002, e-mail message included in this exhibit (P.Ex. H, Pg. 1) documents final resolution of the Personnel Action issue, and indicates that Plaintiff should have been compensated at the GS-15 level for 4 weeks beginning 6/24/01.
[20] Freedman was and is part of the Senior Executive Service (SES).
[21] Freedman made this comment in response to a question as to whether sex, national origin, age, and/or prior EEO complaint activity were considered during the processing and subsequent canceling of the vacancy announcement. [*id.*]

165    Defendant has never permanently promoted a Hispanic Female in the 511 series beyond the

166    Grade 14 in the Treasury OIG.

167        In direct response to Freedman's statements above, evidence clearly shows that Defendant

168    and his managers and supervisors, by Defendant's own policy and by law, were required to know

169    the national origin, sex, and age of their employees;[22] and were not only required to know of

170    Plaintiff's age and Hispanic national origin, but were in fact required to take appropriate action

171    to ensure Plaintiff's right to equal employment opportunity, as follows.

172        Treasury Directive 62-01, *Equal Opportunity Programs*, dated January 29, 1987, specifically

173    provides for an Hispanic Employment Program, at 4.b., and a Women's Executive Leadership

174    Program, at 4.c.(2)(b).  Treasury Directive 62-02, *Safeguard and Notification Requirements for*

175    *Treasury Race and National Origin (RNO) Data,* dated January 29, 1987, states in Section 3.a.,

176    *The Department of the Treasury maintains RNO data for all employees in accordance with*

177    *applicable law and regulations issued by the Office of Personnel Management and the Equal*

178    *Employment Opportunity Commission.*  It is clear from these two Treasury Directives issued

179    in 1987 that management and supervisors at Treasury, to certainly include those at the Treasury

180    OIG, were aware of Plaintiff's Hispanic national origin, sex, and age; and that Treasury

181    management and supervisors were to use this knowledge in order to properly implement

182    Treasury's equal employment opportunity policy and program and other relevant programs.

---

[22] As further clarification, Plaintiff first joined the Treasury OIG during 1983.  Plaintiff's sex, age, and national origin have been part of Plaintiff's official personnel records since 1976, when Plaintiff first started working for the Federal Government.

183       In addition, Part 1614, *Federal Sector Equal Employment Opportunity* under *Subpart A--*

184    *Agency Program to Promote Equal Employment Opportunity,* 1614.102, *Agency Program,*

185    provides the responsibilities of an agency regarding equal employment opportunity.

186    Plaintiff wishes the Court to especially note the following relevant requirements:

187       •   Section 1614.102(a)(5). *Review, evaluate and control managerial and supervisory*

188           *performance in such a manner as to insure a continuing affirmative application and*

189           *vigorous enforcement of the policy of equal opportunity, and provide orientation,*

190           *training and advice to managers and supervisors to assure their understanding and*

191           *implementation of the equal employment opportunity policy and program;*

192       •   Section 1614.102(a)(6). *Take appropriate disciplinary action against employees who*

193           *engage in discriminatory practices;* and

194       •   Section 1614.601 *EEO group statistics* (a). *Each agency shall establish a system to*

195           *collect and maintain accurate employment information on the race, national origin, sex*

196           *and handicap(s) of its employees.*

197       Freedman's statements in light of the law and the above discussion directly implicates

198    Defendant, the Secretary(s) of the Treasury, past and present, and other officials of the United

199    States Government in Plaintiff's claim of a long-term pattern of discrimination, retaliation,

200    disparate treatment, and a hostile/harassing work environment.

201    **Questions.**  What was your role in vacancy announcement OA-2002-0010 for the position of

202    Director of Audit Operations, Supervisory Auditor, GS-511-15?  [#6, D.Ex. 4, Pg. 2]

203    Please explain what occurred with this vacancy announcement.... [*id.*]

204        Freedman's Response (partial, continued):

205        *...the audit operation position is a little different from auditing.  Some of the other*

206        *candidates had more focused operational experience.*  [*id.*]

207        Here Freedman's *Declaration* is purposefully deceptive by what it fails to point out, i.e.,

208    (1) that Plaintiff was one of only two applicants who received a perfect score [#6, D.Ex. 2, Pg. 5]

209    and (2) that Freedman subsequently filled the position with someone who, to the best of

210    Plaintiff's knowledge, is a Non-Minority White Male, younger than Plaintiff, who had less

211    Federal and Treasury OIG experience than Plaintiff, who was not a Certified Public Accountant,

212    and who had information technology (IT) audit rather than audit operational experience.

213        The Court can only assume that Defendant structured the questions on the application

214    in such a manner as to identify the best qualified individuals for the position of Director

215    of Audit Operations.  Plaintiff's score of 100 out of a possible 100 [*id.*] would indicate

216    just how well Plaintiff matched the attributes that OIG management desired for the position.

217        Plaintiff wishes to note that she had also prepared statements to address the *Knowledge,*

218    *Skills, and Abilities* (KSAs) required for the position,[23] as listed in Vacancy Announcement

219    OA-2002-0010 (P.Ex. I, Pg. F-4), but was not given the opportunity to include these under the

---

[23] It should be noted that the KSAs for the position and the qualification statements in the online *Applicant Assessment* focused on qualities required of audit managers and were all areas in which Plaintiff had experience. For example, one of the KSAs was *Applied knowledge of professional auditing standards applicable to Federal financial and program audits,* and one of the qualification statements was *Conduct or oversee audits in accordance with the Government Auditing Standards published by the U.S. General Accounting Office.* (P.Ex. I, Pg. 7)

220   QuickHire system. Plaintiff's responses to the five KSAs (P.Ex. J) provide further evidence of

221   her qualifications for this position. The manner in which Plaintiff's application was

222   misrepresented, including partial and unedited narrative responses (and not just odd characters,

223   as stated by Defendant) that were not at all what Plaintiff submitted,[24] would have had a negative

224   effect when Freedman and Taylor **_looked at the candidates' applications...._** [#6, D.Ex. 4, Pg. 2]

225       <u>Freedman's Response (partial, continued)</u>:

226       **_We decided to cancel the announcement at that time._** [_id._]

227       Plaintiff wishes to note that in subsequent meetings, including Plaintiff's interview when

228   the position was re-announced, Freedman presented it as if the decision had been made at

229   a more-senior management level, rather than characterizing the decision as a mutual one,

230   with which she agreed.

231       In addition, Freedman's statement contradicts a statement in Human Resources Specialist

232   Kimberly T. Mingo's _Declaration_ that **_It was cancelled by the Inspector General, Jeffery (sic)_**

233   **_Rush._** [#6, D.Ex. 2, Pg. 5] Thus, either Freedman's statement is false, or Mingo's statement is

234   false, or both.

235       Also, Plaintiff had attempted to obtain the official date that the position was purportedly

236   cancelled, to no avail. (P.Ex. Q)

237       **<u>Question</u>.** To your knowledge, were sex, national origin, age, and/or prior EEO complaint

238   activity factors considered during the processing and subsequent canceling of this vacancy

239   announcement? Please explain your response. [#6, D.Ex. 4, Pg. 3]

---

[24] Plaintiff is not able to provide a copy of the application as it existed when she submitted it because she was not able to print from the QuickHire system at the time of the initial submittal. This issue is material to the instant civil action.

240     Freedman's Response (partial):

241     ***One of my questions was "If you were selected for the position and given a blank check***

242     ***what would be the first three things you would do with it?"*** *...Then* [Plaintiff] ***said she***

243     ***would provide me with a staffing plan to let me know how much additional staff she***

244     ***need (sic) to get the job done.  At that time, we were working on a tight budget and when***

245     ***she started talking about additional staffing, it stuck with me and bothered me.  The goal***

246     ***was to get the work done within the constraints of the staff that we had, not to get more***

247     ***staffing.*** *[id.]*

248     First, pretext simply does not get any more transparent than this.  Freedman asks Plaintiff

249     to respond under the consideration of being given a ***blank check*** and then, when Plaintiff

250     responded under this consideration, Freedman states she was thinking at the time that she was

251     bothered by Plaintiff's response, due to, Freedman claims, a ***tight budget*** and ***constraints of staff***

252     ***we had***.  Clearly, a ***blank check*** presupposes that there were no budgetary or staffing constraints.

253     Freedman did not communicate any concerns along these lines to Plaintiff at the time of the

254     interview.  In fact, Freedman's instant *Declaration* is the first time Plaintiff has been made

255     aware of Freedman's thinking in these regards.  It is clear that the purpose in this duplicitous

256     type of behavior by a senior Treasury official was to set up Plaintiff so that when Plaintiff

257     responded in good faith to Freedman's ***blank check*** comment, Freedman could claim that it

258     ***bothered*** her.  It is clear that Freedman was simply looking to find a reason to discredit Plaintiff,

259     a highly-qualified applicant who made the Best Qualified List for the position of Director of

260     Audit Operations.  This clearly evidences pretext on the part of Defendant.

261    Second, Freedman's statement in her *Declaration* that there was *a tight budget* is false, as

262    follows. For Fiscal Year (FY) 2002, the Treasury OIG received an appropriation of $35,424,000

263    in budget authority and 282 full-time equivalent (FTE) positions. This funding level represented

264    a net increase of $2,597,000 and 10 FTEs over the FY 2001 enacted levels of $32,827,000 and

265    272 FTEs. For FY 2003, the President's budget proposed $35,424,000 in budget authority and

266    282 FTEs for the OIG. This funding level represented the same funding and FTEs as FY 2002.

267    (P.Ex. R) Further, why would OIG management even consider the position at all and advertise

268    the vacancy if there was a tight budget, which clearly was not the case, and staffing constraints?

269    As further evidence of the falsehood of Freedman's statements and of pretext, Plaintiff

270    submits that Freedman herself subsequently announced the selection of a Director of Audit

271    Operations on February 18, 2005, and then announced an additional promotion into the office of

272    a Grade 14 Manager on March 11, 2005. (P.Ex. K) To Plaintiff's recollection, the position of a

273    Grade 14 Manager had not been announced or presented as a possibility by Freedman during

274    2002, prior to divestiture, when the OIG had a <u>significantly higher budget and level of staffing</u>.

275    In addition, the current Director of Audit Operations uses staff from other OIG directorates

276    for a number of tasks, including assistance with internal quality assurance reviews, with external

277    peer reviews, and with TeamMate (an automated audit package), all of which are indicative of

278    the appropriateness of Plaintiff's statements regarding staffing at the time of her interview

279    during October 2002. In addition, as of March 31, 2005, during Freedman's staffing up of that

280    office, the OIG had only 95 full-time staff onboard and the OIG's appropriation was $16,368,000

281    (P.Ex. O), significantly less than the 282 FTE and $35,424,000 in FY 2002.

282    **Question.** Do you have any knowledge of the Complainant's application for vacancy

283    announcement OA-2002-0010 being mishandled?[25]  If so, what do you know, how and when

284    did you know it?  [#6, D.Ex. 4, Pg. 3]

285    Freedman's Response (partial):

286    ***I am not aware of the Complainant's application being mishandled.*** [*id.*]

287    This is a false statement.  In her *Declaration,* Freedman states that she and Taylor ***looked at***

288    ***the candidates' applications....*** [#6, D.Ex. 4, Pg. 2]  Anyone looking at Plaintiff's application

289    would have seen that there were extensive problems with it, such as missing text and unusual

290    characters.  And Freedman, who had direct knowledge of the quality of Plaintiff's work, and who

291    had reviewed prior applications submitted by Plaintiff for other positions[26] would have known

292    that something was seriously wrong with the application and that it was not reflective of

293    Freedman's experience with Plaintiff's work over the years.

294    As one example of the problems with the application from QuickHire, the printed response

295    that was provided by Mingo to Plaintiff for Question 5.2 contained only one paragraph of

---

[25] In her formal administrative EEO complaint, Plaintiff addresses the misrepresentation of her application under Vacancy Announcement OA-2002-0010 for the position of Director of Audit Operations.  Plaintiff does not state that her application was *mishandled.*

[26] Freedman has been in Plaintiff's chain of command since 1999 [#6, D.Ex. 4, Pg. 1] and has known about the quality of Plaintiff's work and about the performance appraisals, awards, and quality increases that Plaintiff has received over the years, in part because she reviewed Plaintiff's prior applications for promotion.  For example, Freedman reviewed Plaintiff's application of November 30, 2001, for Announcement Number OIG-01-044, Supervisory Auditor, GS-511-15.  [05cv1194 (JGP), #25, P.Ex. K]  The following are just some of the items about which Freedman has been aware.

- Plaintiff's *Exceptional Performance* rating (the highest possible rating) for the period ending June 30, 2001 (*id.,* Pgs. 36-46).
- Plaintiff's *Quality Increase* effective August 26, 2001.  This is an award is reserved for special situations, as it represents a permanent increase in salary.  (*id.,* Pg. 35)
- Plaintiff's *Quality Increase* effective September 27, 1998 (*id.,* Pg. 49)
- Plaintiff's *Certificate of Appreciation for Outstanding Performance* for the period June 1, 1997, to May 31, 1998 (*id.,* Pg. 47)
- Plaintiff's *Special Act or Service Award* effective May 31, 1998 (*id.,* Pg. 48)

296    a detailed response that Plaintiff had entered.  This paragraph began with *In addition*, a clear

297    indication that certain language was missing. (P.Ex. I, Pg. I-7)   Similarly, the printed response to

298    Question 10.2 had the following as the initial paragraph, another clear indication of missing

299    language. (*id.*, Pg. I-8)

300            *the review of the Community Development Financial*
301            *Institutions (CDFI) Fund Post-Award Administration*
302            *Process.*

303        In addition, Plaintiff had notified Mingo, the Human Resources Specialist who handled the

304    announcement for the position of Director of Audit Operations [#6, D.Ex. 2, Pg. 2], of her

305    concerns (P.Ex. I, Pg. A-2).  Plaintiff can only assume that Mingo, in her official capacity, would

306    have responsibly notified Freedman of what had occurred.

307    **Question.**  What is the current status regarding the position of Director of Audit Operations?

308    Do you anticipate that it will be re-announced?  [#6, D.Ex. 4, Pg. 3]

309        Freedman's Response (partial):

310        *We are currently staffing the position by rotating grade 14's into it on a monthly basis. ...*

311        *I asked ...*(Plaintiff) *to rotate into it and she did not want to do that.*  [*id.*]

312        This is a false statement.  Freedman had asked for *volunteers* for this rotating assignment.

313    Plaintiff did not volunteer when the initial request was made (P.Ex. L, Pg. 1) and did not

314    subsequently change her mind (*id.*, Pg. 3).

315    **Question.**  The Complainant alleges that the GS-15 position of Director of Evaluations was

316    filled with an external candidate from Department of Justice instead of being cancelled for

317    budgetary concerns.  Please comment. [#6, D.Ex. 4, Pg. 3]

318    Freedman's Response (partial):

319    *We interviewed for the position of Director of Evaluations in June, July and August 2002.*

320    *At the time of selection, we knew nothing about a possible divestiture.* [*id.*, Pg. 4]

321    Evidence indicates that it is false that interviews for this position occurred during June 2002.

322    Freedman's own calendar indicates that the interviews began on July 30, 2002, and ended on

323    August 13, 2002. (P.Ex. M)

324    In addition, the *Weekly Highlights*[27] from the Inspector General's senior staff meetings,

325    which Freedman as a senior manager would have attended, provide evidence that issues

326    surrounding the formation of the Department of Homeland Security (DHS) and the transferring

327    of law-enforcement bureaus were being discussed during the time frame that Freedman

328    mentions.

329    It was clear that the Inspector General's senior staff, to include Freedman, had an idea of

330    what to expect.  As just one example, it was reported that the IG announced at senior staff

331    meeting at the end of July 2002 that the House passed a bill (H.R. 5005) establishing DHS, and

332    that this bill included establishing an Inspector General office, and transferring the Secret Service

333    and Customs Service from Treasury to DHS.

334    Further, in Congressional testimony[28] on March 12, 2003, Deputy Inspector General

335    Dennis S. Schindel stated the following.  (P.Ex. N)

336    *For fiscal years 2002 and 2003, our net authorized budget authority was $35,397,000 and*
337    *$35,504,000, respectively, and our authorized full time equivalent (FTE) positions were 282*
338    *for both years.  In anticipation of divestiture to the Departments of Homeland Security*

---

[27] Defendant is the source of these documents and should release them to the Court.
[28] The testimony was before the House Committee on Appropriations, Subcommittee on the Departments of Transportation and Treasury, and Independent Agencies.  Pages dealing with divestiture are included at P.Ex. N.

339    *(DHS) and Justice OIGs, last fall we prepared various analyses of our level of effort devoted*
340    *to the Treasury bureaus and functions to be divested to DHS and the Department of Justice.*
341    *We estimated this to be a little over 30 percent in total.*

342    This estimate presented by Schindel to Congress is representative of Treasury OIG

343    management's thinking at the time of the purported cancellation of the vacancy announcement

344    for the position of Director of Audit Operations.  Applying the 30 percent to the 282 FTE

345    indicates that management estimated that the OIG would have approximately 200 FTE.[29]

346    Yet, when Freedman filled the positions of Director (GS-15) and Manager (GS-14) of Audit

347    Operations during the first calendar quarter of 2005 (P.Ex. K), as discussed above, *the OIG had*

348    *95 full-time staff onboard* (P.Ex. O).  The fact that two positions were filled even though the OIG

349    had only about half of the staffing OIG management had estimated it would have when the

350    position was purportedly cancelled, and about a third of what it had in earlier years, is further

351    evidence of pretext on the part of Freedman with reference to her comments about a ***tight budget***

352    and ***constraints of staff*** regarding her thoughts during Plaintiff's interview.

---

353    ### Declaration of HR Specialist Kimberly T. Mingo

354    In an *Unsworn Declaration Under Penalty of Perjury*[30] purportedly executed on April 9,

355    2003, and submitted to the Court in Defendant's March 17, 2006, *Motion to Dismiss or*

356    *for Summary Judgment* [#6, D.Ex. 2] Human Resources (HR) Specialist Kimberly T. Mingo

---

[29] The calculation would be as follows.  282 x .30 = 84.6 FTE

$$282 - 85 = 197 \text{ FTE (or } \textit{approximately 200 FTE})$$

[30] The *Declaration* states that it is made in accordance with the provisions of 28 U.S.C. 1746, and ends with the following statement: *I declare under penalty of perjury that the foregoing is true and correct.*

357  committed perjury, knowingly making false statements material to Plaintiff's case, as presented

358  in this statement to the Court with supporting documentary evidence.[31]  Plaintiff asserts that

359  Defendant's presentation of a false declaration before this Court also evidences pretext.

360       Plaintiff notes that Defendant provides no documentary evidence in support of any of the

361  statements that HR Specialist Mingo makes in her *Declaration*, even though Mingo indicates that

362  documentation exists, without stating what it is. [#6, D.Ex. 2, Pg. 7]  In addition, Defendant fails

363  to provide statements from other parties who clearly had a role in the matters discussed,

364  including but not limited to, Jeffrey Rush, Adam Silverman, Robert (Bob) Taylor, and Edith

365  Greenip. [#6, D.Ex. 2, Pgs. 3, 5]  As such, it is Plaintiff's understanding that Mingo is speaking

366  for these individuals named above; that, as such, absent their personal statements, they too have

367  committed perjury; and that the actions of these individuals clearly evidence conspiracy on

368  their parts to deny Plaintiff her civil right to equal employment opportunity.

369       Plaintiff also notes that there are contradictions in Mingo's *Declaration,* such as when

370  she states, ***I have not had prior involvement in the EEO complaint process***, then states that

371  she has worked on Plaintiff's prior EEO complaints and has provided documentation in these

372  complaints. [#6, D.Ex. 2, Pg. 1]

373       HR Specialist Mingo's *Unsworn Declaration Under Penalty of Perjury* is presented in

374  a question and answer format, which is also used below, with Mingo's statements presented in

375  ***bold italics***, followed by Plaintiff's explanations of why some of Mingo's statements constitute

---

[31] It is noted that this *Plaintiff Statement* addresses only the content of HR Specialist Mingo's above-cited *Unsworn Declaration Under Penalty of Perjury*.  This *Plaintiff Statement* presents false statements by Mingo that have been identified by Plaintiff as of the date of filing, and does not preclude the subsequent identification of other false statements in this or other documents submitted by Defendant.

376    perjury, and why Plaintiff challenges other statements made by Mingo based on available

377    evidence. Plaintiff also provides indisputable evidence of Mingo's perjury in the exhibits that

378    are part of this *Plaintiff Statement.*

379    **Question.** Please explain what occurred with this vacancy announcement.... [#6, D.Ex. 2, Pg. 2]

380        Mingo's Response (partial):

381        ***Prior to our use of Quick Hire, we posted vacancy announcements.... But with***

382        ***Quick Hire we were no longer able to forward a copy to the public folders or print copies***

383        ***to the carousel.** [id.]*

384        This is a false statement that evidences pretext on the part of Defendant for not advertising

385    the position as had been done in the past. Plaintiff was able to print a copy of the vacancy

386    announcement from USAJOBS on 8/28/2002 (P.Ex. I, Pg. F-1). Defendant would have been

387    able to do the same, and to place copies of the announcement in the HR carousel. Plaintiff

388    questions why, if Defendant could *hit "send" and it goes to OPM* (U.S. Office of Personnel

389    Management), the system could not also be used to send a copy to the Treasury OIG.

390    Also, Mingo's *Declaration* is deceptive by what it fails to explain. Defendant has provided

391    no statement as to when Defendant began to post vacancy announcements *on OPM*; no evidence

392    as to whether (and if so, when and how) all Treasury OIG employees were notified that OPM

393    would be the sole method for posting vacancy announcements; and no reason for Defendant's

394    failure to send an e-mail message to all OIG employees letting them know about the vacancy

395    announcement, as had been done in the past. (P.Ex. I, Pg. 5)

396    **Question.** The Complainant alleges that there was no advance notification of any kind that the

397    OIG was revising the manner in which it announced positions, accepted applications, and

398    evaluated applications to determine the best qualified. Please comment.  [*id.*, Pg. 3]

399    Mingo's Response (partial):

400    ***The most common place for employees to find vacancy announcements is through the***

401    ***OPM USAJOBS website.  That did not change with the new system.*** [#6, D.Ex. 2, Pg. 3]

402    Plaintiff believes this was a false statement at the time it was made.  Plaintiff questions the

403    veracity of this statement as it would apply to Treasury OIG employees at the time that Vacancy

404    Announcement OA-2002-0010 was posted, and requests that Defendant be required to provide

405    supporting documentary evidence in support of this material fact that is in dispute.  Mingo

406    makes it very clear in her *Declaration* that up until that time, the Treasury OIG used a variety

407    of methods to ensure that its employees were aware of vacancy announcements, including

408    posting to an internal listing and putting copies on a carousel where they would be readily

409    available.  [*id.*] and (P.Ex. I, Pg. 5)  In addition, a *Vacancy Announcements* Listing was included

410    as an attachment to an e-mail message sent to all OIG staff on a weekly basis by Human

411    Resources staff when there were new announcements. (*id.*)  It was also customary to mention in

412    staff meetings that vacancies had been announced, and management often advised eligible

413    employees verbally or through e-mail. (*id.*)   There is no evidence whatsoever for Mingo's

414    statement that the OPM USAJOBS web site was the most common place for employees to find

415    vacancy announcements at that time.

416   **Question.** The Complainant alleges that the major differences in the announcement process

417   were as follows. Please comment on each item.

418      (5) Applicants were not allowed to print a complete copy of their application prior to

419   submittal thus affording her[32] the opportunity to check the document. [#6, D.Ex. 2, Pgs. 3-4]

420   Mingo's Response (partial):

421   ***She apparently had problems in printing…. …we printed out a copy for her.***

422   ***I believe she then complained about some unusual characters that had printed in***

423   ***her resume.*** [*id.,* Pg. 4]

424      This response in Mingo's *Declaration* is purposefully deceptive by what it fails to point out,

425   i.e., that she knew, based on a September 17, 2002, e-mail message from Plaintiff to Mingo

426   (P.Ex. I, Pg. A-2) that Plaintiff felt there was a serious problem in that the documents that Mingo

427   provided did not accurately reflect what Plaintiff submitted online. In this message, Plaintiff

428   expressed concern that some of the information that she included in the responses to the

429   questions was not reflected in the printed version, and that there were unusual characters in the

430   responses to the questions. As explained in the message, the problems were extensive. For

431   example, one question (#5.2) contained only one paragraph of a detailed response that Plaintiff

432   had entered.

433      Also, Plaintiff raised the issue of unusual characters printing, but the example she cited was

434   from Question 13.2 in the *Applicant Assessment* section of the QuickHire application, not the

---

[32] Plaintiff believes that *her* and *she* in this section refer to Plaintiff because of the initial reference to *the Complainant* in the question.

435    résumé. (P.Ex. I, Pg. A-2)  The problems were with Plaintiff's entire application, not just with

436    the résumé as Mingo claimed.

437    **Question.** The Complainant alleges that the major differences in the announcement process

438    were as follows.  Please comment on each item.

439        (6) The Knowledge, Skills, and Abilities (KSAs) in the announcement and in the online

440        application did not directly correspond and some aspects of the KSA's were not addressed at

441        all in the online questionnaire.  The complainant alleges the requirements for the position were

442        presented so as to limit competition and may have been structured for a specific individual.

443        [#6, D.Ex. 2, Pg. 4]

444        Mingo's Response (partial):

445        ***With Quick Hire, we really don't have KSA's.*** [*id.*]

446        This is a false statement.  Vacancy Announcement OA-2002-0010 at USAJOBS Control

447    No. TS3169 FM clearly states that the five KSAs listed below are *necessary for this job*.

448    (P.Ex. I, Pgs. 7 and F-4)

449    KSA 1.  Applied knowledge of professional auditing standards applicable to
450            Federal financial and program audits.

451    KSA 2.  Skill in establishing and maintaining effective working relationships with
452            high-level officials, other Federal agencies, Congressional staff, and professional
453            organizations.

454    KSA 3.  Ability to direct and supervise a diverse staff of professionals on multiple
455            tasks.

456    KSA 4.  Ability to prepare and deliver oral briefings to the Inspector General (IG)
457            and top Department officials.

458    KSA 5.  Ability to prepare written communications to develop clear, concise
459            reports; oral and visual presentations; and completed staff work.

460      <u>Mingo's Response (partial, continued):</u>

461      ***Under Quick Hire, instead of narrative questions, the information is obtained by a group***

462      ***of questions answered by "yes", "no", a multiple choice or a limited summarization of***

463      ***the information.  It eliminates the applicant's ability to give a long statement.***

464      [#6, D.Ex. 2, Pg. 4]

465      While there were limitations as to the number of characters that could be included in the

466      résumé and in each of the narrative responses describing experience that applicants were

467      required to provide, a stricture that did not exist for prior vacancy announcements within the

468      OIG, a response as long as 3-1/2 pages was permitted, which indicates that the second sentence

469      in Mingo's response above is not true.  (P.Ex. I, Pgs. 6 and I-10 to I-14).

470      Also, it is clear that under QuickHire information is <u>not</u> obtained by limited summarization.

471      Given the manner in which Plaintiff's application was misrepresented, it is inconceivable that

472      Plaintiff would have received a perfect score [#6, D.Ex. 2, Pg. 5] if QuickHire performed an

473      analysis of the text in the narrative sections and assigned points for the information contained

474      therein given the omitted language.

475      <u>Mingo's Response (partial, continued):</u>

476      ***The next time the job is posted, we will use the same questions.***  [#6, D.Ex. 2, Pgs. 4-5]

477      This is a false statement.  To Plaintiff's knowledge, the next time the job was posted was

478      when the position of Director of Audit Operations, Supervisory Auditor, was re-announced under

479    Vacancy Announcement OA-2005-007, GS-0511B-15, on November 30, 2004.[33]  The questions

480    used were not the same.

481        Below are key differences noted for the questions[34] for which a narrative response describing

482    experience was required.  These are just a few examples of the differences between the two

483    vacancy announcements that illustrate the falsity of Mingo's statement.  At the request of the

484    Court, Plaintiff can submit a more-detailed analysis.

485        As represented by Defendant,[35] Vacancy Announcement OA-2002-0010 required a

486    narrative response describing experience for the following four statements in the *Applicant*

487    *Assessment* (AA) section.  (P.Ex. I)

488            AA 4.  Develop and implement policies for audit quality assurance and conduct
                    internal reviews and external peer reviews of audit organization compliance
                    with professional standards. (*id.*, Pg. I-4)

489            AA 5.  Incorporate input from a variety of sources (Departmental Management,
                    Congressional staffers, current events) into the development of strategic and
                    annual plans for the allocation and expenditure of Audit resources. (*id.*, Pg. I-7)

490            AA 10. Conduct or oversee audits in accordance with the Government Auditing
                    Standards published by the U.S. General Accounting Office. (*id.*, Pg. I-8)

491            AA 13. Act as liaison between audit organization and Congress. (*id.*, Pg. I-10)

---

[33] In the interest of full disclosure, Plaintiff notes that this vacancy was first posted as OA-2005-005 on 11/26/2004;
then as OA-2005-007 on 11/30/2004.  Plaintiff refers only to OA-2005-007 when she discusses the re-announced
position.  Also, to Plaintiff's knowledge this was the first time that the Treasury OIG posted a vacancy
announcement for the position of Director of Audit Operations after the posting of OA-2002-0010.  If Defendant
alleges that there was an interim posting, Plaintiff requests that Defendant provide documentary evidence of when
this was done and what questions were asked of applicants.
[34] The term *question* is used to refer to numbered items for which responses were required, whether or not stated in
an interrogatory manner.
[35] These are taken from a print-out from the QuickHire program provided to Plaintiff by Mingo.

492    As represented by Defendant,[36] Vacancy Announcement OA-2005-007 required a narrative

493    response describing experience for the following three statements. (P.Ex. P)

494    4. Please briefly describe at least two examples of audit projects you have led, and your
495        specific leadership responsibilities with respect to these projects. (*id.,* Pg. P-2)

496    9. Please briefly describe your involvement in one or more of the above activities.
497        (*id.,* Pg. P-7)
498        The activities listed in #8 were: (*id.,* Pg. P-6,-7)
499        • Served as a spokesperson for my organization on program or project issues
500        • Served on panels, committees, or task forces on technical, programmatic,
501          and/or professional issues with impact on the entire organization
502        • Provided guidance to other agency representatives or private industry on
503          technical, programmatic, or professional issues
504        • Facilitated interagency workshops or partnering sessions
505        • Built and fostered relationships with external customers or stakeholders that
506          affect the scope of organizational programs or projects
507        • Presented briefings and formal presentations to senor management of an
508          audited entity or other external organizations on policy, program, or project
509          issues

510    17. Please briefly describe your experience related to organization-wide planning and
511        operations. (*id.,* Pg. P-10)

512    It is clear from a comparison of these two lists that, contrary to Mingo's *Declaration,* the

513    same questions were ***not*** used.

514    This provides direct evidence in support of Plaintiff's position that Defendant manipulated

515    the process to limit competition and to achieve a desired discriminatory and retaliatory result,

516    in clear violation of, in Plaintiff's case, the laws, rules, and regulations governing equal

517    employment opportunity and the Merit System Principles.

---

[36] These are taken from an e-mail message from careerconnectorhelp@do.treas.gov received by Plaintiff following
her application under Vacancy Announcement OA-2005-007. (P.Ex. P)

518    **Question.** The Complainant alleges her application was mishandled. [37] Please comment. ...

519    [#6, D.Ex. 2, Pg. 5]

520    Mingo's Response (partial):

521    ***Her application was never mishandled. ...The difference in the whole process and the fact***

522    ***that there were odd characters printed out in her application are the only things I can***

523    ***recall.  However, all applicants went through the new process and many had odd***

524    ***characters printed out on their application.*** [*id.*]

525    As explained more fully above, Mingo's *Declaration* is purposefully deceptive in the manner

526    in which it mischaracterizes the misrepresentations that occurred in the printed version of

527    Plaintiff's application.  Mingo knew of these problems (P.Ex. I, Pg. A-2), which were not just

528    about the *odd characters* that Mingo claims many had on their applications.  It is clear that the

529    problems with Plaintiff's application were more extensive, as explained in Plaintiff's e-mail

530    message to Mingo.  (*id.*)  It is also clear that Plaintiff's was the only application that had these

531    serious problems of deletions of major portions of text indicating purposeful intent.

532    **Question.**  Who cancelled vacancy announcement OA-2002-0010, when was it cancelled and

533    Why?  [#6, D.Ex. 2, Pg. 5]

534    Mingo's Response (partial, continued): ***I don't recall exactly when it was cancelled. ...***

535    ***The promotion certificate was good through the end of November 2002.  I believe it was***

536    ***actually cancelled sometime in December 2002 but I'm not sure.*** [*id.*]

---

[37] See Footnote 25.

537      Plaintiff asserts that this is a false statement.  As the HR Specialist who handled the

538   announcement, Mingo would have direct knowledge of the official date of its cancellation.  It is

539   noted that Plaintiff attempted to obtain the official date, to no avail.  (P.Ex. Q)

540      Mingo's Response (partial, continued):

541      ***It was cancelled by the Inspector General, Jeffery (sic) Rush.***  [#6, D.Ex. 2, Pg. 5]

542      This statement contradicts a statement in AIGA Freedman's *Declaration* that she, Schindel,

543   and Rush jointly decided to cancel the announcement. [#6, D.Ex. 4, Pg. 2]  Thus, either Mingo's

544   statement is false, or Freedman's statement is false, or both.

545      Mingo's Response (partial, continued):

546      ***Word had come in that we were going through a divestiture to Homeland Security.***

547      ***By the time word came down, we actually lost 191 employees out of approximately 284.***

548      [#6, D.Ex. 2, Pg. 5]

549      Either Mingo's statement is false, or Deputy Inspector General Dennis S. Schindel made

550   false statements before Congress[38] when he gave the following testimony, or both.

551      *Our office was directed to divest 155 positions to the DHS OIG and 40 positions to the*
552      *Justice OIG.  This total divestiture of 195 out of 282 FTE represents nearly 70 percent of our*
553      *staffing.*  (P.Ex. N)

---

---

[38] The testimony was before the House Committee on Appropriations, Subcommittee on the Departments of Transportation and Treasury, and Independent Agencies on March 12, 2003.

554    Plaintiff wishes to question Freedman, Mingo, and other officials of the United States

555    Government under oath before a jury for additional evidence regarding their compliance with the

556    laws, rules, and regulations governing, and their commitment to, equal employment opportunity.

557    This *Plaintiff Statement* provides clear evidence of false statements material to Plaintiff's

558    case in AIGA Marla A. Freedman's *Unsworn Declaration Under Penalty of Perjury* purportedly

559    executed on April 17, 2003, [#6, D.Ex. 4] and in HR Specialist Kimberly T. Mingo's *Unsworn*

560    *Declaration Under Penalty of Perjury* purportedly executed on April 9, 2003 [#6, D.Ex. 2].

561    Plaintiff asserts that these material false statements by Freedman and Mingo were made

562    willfully, knowingly, and with the intent to misrepresent to and deceive the Court.  The fact that

563    Freedman and Mingo have made these false statements indisputably proves that the reasons

564    given for the adverse actions taken against Plaintiff, including non-selection for promotion, were

565    pretextual; and provides indisputable material evidence in support of Plaintiff's overarching

566    claim of a long-term pattern of discrimination, retaliation, disparate treatment, and

567    a hostile/harassing work environment.  It also provides evidence of conspiracy by officials of the

568    United States government to deny Plaintiff her civil right to equal employment opportunity.

569    Briefly and further in these regards, Plaintiff also wishes to note that Freedman's first line

570    supervisor was and is Dennis Schindel,[39] current Deputy Inspector General, the senior Treasury

571    management official that Plaintiff has identified as the person most responsible for Plaintiff

---

[39] Schindel, like Freedman and many others throughout Plaintiff's over 20-year career with the Treasury OIG, was also very complimentary of Plaintiff's work when he was Plaintiff's first line supervisor for a period in 1991 [04cv0589 (JGP), #16, P.Ex. C-2 (3 pages)].  Schindel, as a senior Treasury management official, has had direct knowledge of Plaintiff's work ethic and high-level of performance since at least 1991, and has been in a position to influence Plaintiff's career since that time.

572    being forced, to date, to file nineteen formal administrative EEO complaints and four civil

573    actions against Defendant in pursuit of her civil right to equal employment opportunity.

574    In addition, Freedman, in speaking for Schindel, for Inspector General Jeffrey Rush, and for

575    Deputy AIG Robert (Bob) Taylor [#6, D.Ex. 4, Pg. 2], absent their own personal statements,

576    provides direct evidence of conspiracy by those mentioned.

---

577        In conclusion, Plaintiff respectfully requests that the clear and indisputable pattern and

578    practice of senior management officials of the Department of the Treasury knowingly making

579    material false statements in this case and in related cases 04cv0589 (JGP) and 05cv1194 (JGP)

580    be referred by the Court for criminal prosecution.

581        This *Plaintiff Statement Regarding Defendant's False Statements and Perjury*

582    *Before the Court* comprises this 32-page statement, a 2-page listing of Plaintiff's exhibits,

583    P.Ex. A-R comprising 101 pages, and a certificate of service.  All are attached hereto.

Respectfully Submitted,

Maria V. Carmona, *pro se*
8306 Haven Hill Court
Laurel, Maryland  20723
(301) 490-4328